IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| ROBERT W. KRAMER, III *dba* CIS INTERNET SERVICES,<br><br>   Plaintiff,<br><br>vs.<br><br>HENRY PEREZ; SUZANNE BARTOK; and GARY C. BROWN,<br><br>   Defendants. | No. 3:04cv0153-JAJ<br><br>**AMENDED AND SUBSTITUTED ORDER** |

This matter comes before the court pursuant to trial on the merits held November 27-28, 2007. The plaintiff was present and represented by Matthew Preston. Defendants Perez and Bartok were present and represented by Davis Foster. Defendant Brown was present and represented by Ted Breckenfelder. The court finds in favor of the plaintiff and against defendants Perez and Bartok. The court finds in favor of defendant Brown and against the plaintiff.

## I. NATURE OF THE CASE

This case was commenced under Iowa anti-computer e-mail spam legislation and other legal theories alleging that the defendants were responsible for the transmission of millions of unsolicited commercial bulk e-mail during a four-month period in 2003. The plaintiff sues for liquidated damages of ten dollars ($10.00) per e-mail and contends that his internet service provider business was severely damaged as a result of the defendants' activities. The defendants each deny sending any e-mails. All three defendants contend that there is no individual liability for any actions taken on behalf of the corporation against whom a default judgment has already been entered. Defendant Gary Brown

contends that he only served as the company's outside accountant, hired to prepare income tax returns and other routine filings. The court makes the following findings of fact and conclusions of law.

## II. **FINDINGS OF FACT**

The plaintiff, Robert Kramer, is a citizen of Iowa, residing in Clinton, Iowa. He operates an internet service provider ("ISP") and does business as CIS Internet Services. Defendants Henry Perez and Suzanne Bartok are husband and wife. At all times material to this case, they were citizens of Arizona. They owned AMP Dollar Savings ("AMP"), a corporation which did business under its own name as well as under other names such as Sensible Savings, Plastic Profits, Mortgageleads.tv and Leads.tv. Defendant Gary Brown is a certified public accountant and a citizen of Arizona. The amount in controversy in this matter exceeds $75,000.

Kramer is a native Iowan having lived most of his life in Clinton, Iowa. In January 1996, Kramer offered internet services as an ISP. Most of his customers reside within a twenty-five mile radius of Clinton, Iowa. By 2001 CIS had grown to approximately 5,000 customers. By the time of trial, it had approximately 1,200 customers.

AMP has some history soliciting sales through unsolicited bulk e-mail. Plastic Profits was in the business of creating merchant accounts. This means that Perez would assist internet businesses in establishing credit card payment capabilities for internet purchases. While working as Plastic Profits, Perez had sent out 10,000 to 50,000 e-mails per day to solicit his services. (Exs. 8A and 8B). Plastic Profits later got in the business of selling mortgage leads. A mortgage lead is simply the name and contact information for a person who has expressed an interest in financing or refinancing a residential mortgage.

All e-mail users are familiar with the problems associated with spam (unsolicited

bulk e-mails).  By the year 2001, spam had become a major problem for internet service providers.  By the year 2003, Kramer had to spend approximately $35,000 to upgrade to two dozen servers, dedicating three servers exclusively to handling the e-mail traffic associated with spam.  He spent approximately sixty hours a week blocking spam e-mails.

Kramer's problem with spam e-mail was exacerbated by software being marketed as "Bulk Mailing 4 Dummies".  Included with the "Bulk Mailing 4 Dummies" software were millions of internet addresses.  The software included 2.8 million e-mail addresses for the plaintiff's domain name, cis.net, notwithstanding that the cis.net domain name only had approximately 5,000 customers with no more than 6,000 unique addresses.  This software allowed its users to quickly send millions of e-mails to Kramer's servers, which would then have to sort them out as spam.

Kramer hired attorney Kelly Wallace from the Atlanta law firm of Wellborn and Wallace.  Kramer's goal was to determine the source or sources of spam e-mail.  Kramer set up accounts for Mr. Wallace to access the e-mail traffic.  Kramer then took thirty-six "cis.net" addresses from the "Bulk Mailing 4 Dummies" software that were not associated with real customers and removed the spam filters so that e-mails to these addresses could be received by Mr. Wallace.

On October 8, 2003, Wallace received an e-mail from Samantha_Nicole@lycos.co.uk.  It was spam.  There is probably someone in the United Kingdom with this e-mail address.  However, subsequent investigation revealed that this account was taken over by a spammer for the purpose of sending this and other e-mails. One of the hallmarks of spam is that at some point in the transmission, the e-mail goes through a country such as China or Russia to avoid tracing and then covertly overtakes computers to send the final transmission.

The e-mail (Ex. 16, p. 1) was an advertisement to refinance a home mortgage. Each line of the body of the message is followed by a string of randomly generated letters

and symbols designed to prevent ISPs from detecting common patterns and blocking the e-mail as spam. The second to the last line in the e-mail states, "Click Here for our special low rates". Mr. Wallace clicked where requested and it took him to a mortgage loan refinancing website. (Ex. 5). Wallace filled out a mortgage "solicitation" using the fictitious name "George P. Burdell". He claimed to live in Gotham, South Dakota and gave the false zip code of 55755. However, he provided his own actual cellular telephone number. Within a day or two, he was contacted by an individual identified as Matt from a company called Cal Capital. Wallace's telephone's caller ID indicated that the call had come from a southern California location.

Cal Capital is an Orange, California, mortgage broker. It acts as a middleman for homeowners and lenders to refinance residential mortgages. On December 9, 2003, a subpoena was issued to Jonathan Baumann as registered agent for Cal Capital Credit, Inc., requesting all documents that related in any way to the generation of a marketing lead for potential customer "George Burdell" and/or the generation of the lead that resulted in any telephone call to Wallace's cell phone. In response to the subpoena, Baumann provided everything that he had available to him at the time he received the subpoena. However, his records were incomplete because many things, such as the original mortgage lead information, had been deleted from his computer in the regular course of business because no loan was placed from the lead. Baumann was able to provide records of payments to Perez and Bartok's company for mortgage leads during 2003 but he had no record of payments in October 2003. Baumann was buying mortgage leads daily from Mortgageleads.tv and that was the only entity from whom he purchased leads in 2003. Baumann believed that Cal Capital had placed the call to "George Burdell" because he recalled checking his telephone bill.[1] In fact, Mortgageleads.tv had established an

---

[1]Mr. Baumann's deposition was taken almost four years after the October 2, 2003, call
(continued...)

4

agreement in December 2001 to provide leads to Cal Capital. The letter confirming that arrangement was signed by defendant Suzanne Bartok. (Ex. 2.)

An examination of twenty-three e-mails sent to the thirty-six e-mail accounts monitored by Mr. Wallace demonstrates the spam nature of these e-mails. All of them relate to mortgage refinancing. While there are two different e-mails, these e-mails are similar in their fonts, text, and typographical errors.[2] The twenty-three e-mails were sent from e-mail addresses that had only seventeen unique user names and only sixteen unique domain names.[3] Kramer then searched his e-mail logs and determined that between August and December, 10,489,887 e-mails were sent to cis.net using those seventeen unique user names. An additional 13,158,179 e-mails were sent using the same domain names, for a total of 23,648,066 e-mails sent. (Ex. 20).

.    Perez denied generating any spam relating to mortgage leads. He testified that he bought leads and traded them to other mortgage lead generators. That is, if he had 200 mortgage leads, he claimed that he could trade them to another mortgage lead generator for 200 of the other party's leads and then each would have 400. He claims that he built up a database of between 1,000,000 and 1,500,000 mortgage leads by buying them or trading them. He did not have a credible explanation as to why people would trade leads, why they would be valuable after they were traded and who actually traded with him.

---

[1](...continued)
was placed to Mr. Wallace. This testimony comes from his best recollection, which is not perfect. He believes that he checked the phone bill but did not have an independent recollection of this. He was very clear, however, in his recollection that Mortgage Leads.tv was the only entity from whom he was purchasing leads at that time.

[2]For example, both of the e-mails spell don't as "dont" or haven't as "havent". All of them contain a space at the end of the sentence before the punctuation such as an exclamation point or a question mark. Every single one of them ends with, "Click Here for our special low rates". All of them finish with, "No Obligation and Fast Approval Service".

[3]In the e-mail address "john.doe@cis.net" john.doe is the user name, cis.net is the domain name.

According to his testimony, Perez had five computers in 2003 on which he maintained records of his businesses. One was infected with a virus and the other four, including the one that contained his database of mortgage leads, were not. He claims that at some point shortly prior to being served with a civil complaint in a related anti-spam lawsuit against AMP, he decided to discontinue his mortgage leads business. Although his testimony was very confusing, he claimed that some of his computers had been disassembled and that they were sold, in whole or in part, to a local school or the neighbor kids. The claim that he was getting out of the mortgage lead business in late 2003 is inconsistent with records of payments that he made for software and the hiring of an employee to upgrade his computer system in late 2003.

Perez claims that some of the hard drives from the computers were erased and others were just thrown in a dumpster. However, very shortly after being served with the related lawsuit against AMP in March 2003, Perez started a new company called Prime Time Mortgage. Documents associated with Prime Time Mortgage show that Perez intended his new business to commence on April 1, 2004. When questioned about the nature of Prime Time Mortgage's business, Perez first indicated that it was similar to Mortgageleads.tv. When pressed further, he admitted that the business was exactly the same.

Perez stated that he and Bartok made over $500,000 selling mortgage leads in 2003. He further claimed that he had spent $600-700,000 purchasing leads during that year. Still, he desired to get out of the business because he and his wife were preoccupied with Suzanne Bartok's illness and the need to assume the role of general contractor on a seven-figure home they were building. Suzanne Bartok testified that she was unable to work at some point and focused on raising her children. However, income tax records show that she claimed $44,000 income in 2004 from Prime Time Mortgage and that Henry Perez only claimed $24,800. When pressed on this issue, Bartok claimed that she made up the

$44,000 figure to assist with securing a loan at the bank. Perez testified that they purchased all new computers when they began Prime Time Mortgage.

Because of the claimed destruction of their computers, defendants Perez and Bartok produced almost nothing in discovery. They produced several of their personal income tax returns and checks they claim were used to purchase leads from an individual who Perez now recognizes as a prolific spam generator. One thing remained constant, however. Despite the high volume of business he claimed generating mortgage leads, he cannot seem to remember the name of anyone with whom he did business. When deposed, he could not remember to whom he sold mortgage leads, could not remember with whom he traded mortgage leads and, even now, he can only remember one person from whom he ever purchased mortgage leads. He identified that individual only after counsel for Kramer revealed the name to him. The same is true with Cal Capital. Perez now freely admits that he sold mortgage leads to Cal Capital but only after being informed of that name by Kramer. Perez further states that shortly before AMP's registered agent and accountant was served with the related anti-spamming case, he retrieved whatever records he possessed and shredded them.

The court simply does not believe Mr. Perez or Ms. Bartok. It is clear from the deposition testimony of Mr. Wallace and Mr. Baumann that the mortgage lead relating to George Burdell was acquired by Cal Capital pursuant to spam e-mail generated by Mortgageleads.tv. Perez and Bartok were the only active employees of Mortgageleads.tv. They generated leads, they solicited customers for the leads, sold the leads and received the profits from this illegal business. Perez, in particular, was experienced with spam. The claim that they conveniently but inadvertently destroyed all the records of their company, just prior to being served with a civil action, rings hollow.

Defendant Gary Brown was not shown to have played any substantial part in the illegal nature of Mortgageleads.tv. He prepared tax returns and made some other routine

corporate filings for Perez and Bartok, but was not shown to have actively participated in any of the underlying business transactions. While some filings may have shown him to be an officer of the company, the evidence showed him to be what he said he was, the outside certified public accountant.

### III. CONCLUSIONS OF LAW
#### A. Iowa Anti-Spamming and Anti-Spoofing Act

Iowa Code §714E.1(2)[4] provides:

> It is unlawful for a person to use an interactive computer service to initiate the sending of bulk electronic mail that the sender knows, or has reason to know, violates any of the following:
>
> > a. Uses the name of a third party in the return address field without permission of the third party.
> >
> > b. Misrepresents any information in identifying the point of origin of the transmission path of the electronic mail.
> >
> > c. Does not contain information identifying the point of origin or the transmission path of the electronic mail message.
> >
> > d. With respect to an unsolicited advertisement, does not, at a minimum, provide an electronic

---

[4] Iowa Code Chapter 714E was repealed in May 2005 and replaced with Iowa Code Chapter 716A, which relates to the transmission of electronic mail, including the transmission of unsolicited bulk electronic mail and the sale or offer for direct sale of prescription drugs and the sale of adulterated or misbranded drugs through the use of electronic mail or the internet, and provides for penalties. However, the court will consider the defendants' actions under §714E.1 et seq., as it was the law in effect at the time in question.

> mail address readily identifiable in the advertisement to which the recipient may send a request for declining such electronic mail.
>
> e. Demonstrated a pattern of sending unsolicited advertisements to a recipient who has sent the person a request for declining such electronic mail following a reasonable time, which in no event shall be more than five business days, after the receipt by the person of such request.

The court finds that defendants Perez and Bartok violated Iowa Code § 714E.1(2)(b), (c) and (d). Based on the testimony of Baumann that Cal Capital was only buying mortgage leads during the relevant time period from Perez, coupled with the testimony of Wallace and the incredulous memory and document lapses of Perez, the court finds that Kramer has proven by a preponderance of the evidence that the spam e-mails originated with Perez and Bartok. The e-mails, which were unsolicited advertisements, did not identify the point of origin or the transmission path and did not provide a "readily identifiable" e-mail address to which the recipient could send a request for declining further e-mails. As such, the court finds in favor of Kramer and against Perez and Bartok on Kramer's Iowa Code Chapter 714E claim. Kramer offered no evidence linking Brown to Perez and Bartok's spamming. The fact that Brown was Perez and Bartok's accountant does not support a finding of liability under Chapter 714E. The court therefore finds in favor of Brown and against Kramer on this claim.

### B. Individual Liability

The court rejects Perez and Bartok's arguments that they are shielded from individual liability in this matter due to their roles as corporate officers of AMP Dollar Savings. The plain language of Iowa Code § 714E.2 states that it is "unlawful for a person

to use an interactive computer service to initiate . . . " Iowa Code § 4.1 (20)[5] defines a "person" as follows: "Unless otherwise provided by law, 'person' means individual, corporation, limited liability company, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity."

While Bartok may not have been the "person" hitting the "send" button to create the spam e-mail, she was half owner of a business whose sole source of income was predicated on illegal spamming. Bartok signed the 2001 agreement for Mortgageleads.tv to provide mortgage leads to Cal Capital. To disclaim knowledge of the core and only business activity is not credible. Bartok's actions were knowing and provided substantial assistance to Perez's spamming operation, which Bartok knew to be unlawful. She is also responsible for failing to produce any records of her activities. Thus, Bartok is liable under theories of both aiding and abetting and civil conspiracy. See Riley v. Anderson, 727 N.W.2d 102, 114 (Iowa 2006) (finding that "aiding and abetting" for purposes of tort liability, requires that the defendant knowingly gave substantial assistance to another in committing an act the defendant knew to be tortious); Tubbs v. United Cent. Bank. N.A., Des Moines, 451 N.W.2d 177, 183-84 (Iowa 1990) (noting that a conspiracy is a "combination of two or more persons to accomplish, through concerted actions, an unlawful end or a lawful end by unlawful means"). The judgment in this matter shall be against Perez and Bartok, individually.

### C. Plaintiff's Remaining Claims

In addition to Kramer's successful claim under the Iowa Code Chapter 714E, he also asserted a federal RICO claim, a federal Computer Fraud and Abuse Act claim, an Iowa Ongoing Criminal Conduct Act claim, unauthorized computer access, and common law claims of unfair competition, conversion, trespass, unjust enrichment, intentional

---

[5]The introductory paragraph of Iowa Code § 4.1 states that "[i]n the construction of the statutes, the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute.

interference with contract and intentional interference with prospective business advantage. The court has reviewed the essential elements of those claims and finds that Kramer has not proven those elements by the preponderance of the evidence, specifically, the element of actual damages. The court finds in favor of all three defendants and against Kramer on these claims.

## IV. DAMAGES

The "civil damages" provision of Iowa Code §714E.1 states:

> [I]f the person injured is an interactive computer service and such injury arises from a person who transmits bulk electronic mail without authority, such service may recover actual damages, attorney fees, and costs. Such service, in lieu of recovering actual damages, may also elect to recover the greater of ten dollars for each unsolicited bulk electronic mail message transmitted in violation of this section, or twenty-five thousand dollars.

Iowa Code §714E.1(3)(b)(1).

Defendants Perez and Bartok propounded the following interrogatory on Kramer:

> Interrogatory No. 12: Specify the amount of damage you are claiming against the Defendants Henry Perez and Suzanne Bartok for each of the claims made by the Plaintiffs, and with regard to each item or element of damage, state the following:
>
> a.   item or element of damage;
>
> b.   amount of damages claimed for each item or element;
>
> c.   method used to calculate the damages;
>
> d.   documentation supporting both the item or element of damage and the amount of damages calculated;
>
> e.   identify the person with this information.

11

Kramer responded as follows:

> For Defendants' violation of Iowa's anti-spamming and spoofing statute, Plaintiff's claim is based on the 40,000 illegal unsolicited commercial e-mail messages sent by Defendant (using the resources of their corporation, AMP Dollar Savings, Inc. ("AMP Dollar") each day from August 1, 2003 through December 31, 2003 into each of Plaintiff's 3 mail servers. This produces a total of 18,000,000 (eighteen million) illegal unsolicited commercial e-mail messages.
>
> Iowa's anti-spamming and spoofing statute [sic] Plaintiff to elect to recover ten dollars per message as statutory damages, for a total of $180,000,000 in statutory damages.
>
> In addition, because the anti-spamming and spoofing statute is also a criminal statute, the ongoing intentional violation of the statute constitutes ongoing criminal conduct by Defendants, entitling Plaintiff to a mandatory trebling of the statutory damages (emphasis in the original).

Federal Rule of Civil Procedure 37(c)(1) provides, in pertinent part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any information not so disclosed.

Kramer never supplemented his discovery response to include actual damages he claims to have sustained. Discovery in this matter closed on April 1, 2007. That Kramer included a claim for actual damages in his affidavit resisting summary judgment, filed on September 4, 2007, or in the proposed Final Pretrial Order, is insufficient. The court sustained the defendants' objection to the introduction of such evidence. Kramer then introduced the evidence as part of an offer of proof. The court declines to reverse its prior ruling as Kramer has provided no justification for his failure to supplement his discovery response to include his actual damages claim while discovery was still open.

"For litigation to function efficiently, parties must provide clear and accurate responses to discovery requests. Parties are 'entitled to accept answers to previous interrogatories as true, and to refrain from seeking additional discovery directed to the same issue.'" ELCA Enterprises, Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th Cir. 1995) (internal citations omitted) (affirming the district court's refusal to allow plaintiff's "eleventh-hour attempt to switch the basis for its alleged damages"). See also U.S. Salt, Inc. v. Broken Arrow, Inc., 2008 WL 2277602 (D. Minn. 2008) (excluding plaintiff's previously undisclosed evidence on its new damages claim, noting that defendant had not had a full opportunity to test the reliability of this evidence through discovery and expert analysis, and finding that plaintiff's failure to disclose its new damages claim was neither substantially justified nor harmless).

Alternatively, the court finds Kramer's evidence of his actual damages to be impermissibly speculative to support any such award. As part of the offer of proof, Kramer testified that he spent 60 hours per week fighting spam and that his time was worth $100.00 per hour, but provided no evidence as to what portion of spam he was fighting was from Perez and Bartok. Likewise, Kramer testified that he lost 1,000 customers in 2003 and estimates that 800 of them were due to spam issues, but provides no evidence to support his estimate. The court finds that Kramer has not sufficiently proven his actual damages.

Upon the foregoing,

**IT IS ORDERED** that judgment in the amount of Two Hundred Thirty Six Million Four Hundred Eighty Thousand Six Hundred Sixty Dollars ($236,480,660.00) shall be entered in favor of the plaintiff and against defendants Henry Perez and Suzanne Bartok, jointly and severally, on Kramer's Iowa Code Chapter 714E claim.

**IT IS FURTHER ORDERED** that judgment shall enter in favor of defendants Henry Perez and Suzanne Bartok and against plaintiff Kramer on all remaining claims.

**IT IS FURTHER ORDERED** that judgment shall enter in favor of defendant Gary C. Brown and against plaintiff on all claims.

**IT IS FURTHER ORDERED** that costs and attorney fees shall be taxed to defendants Perez and Bartok.

**DATED** this 30th day of September, 2008.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA